H. & C. NEWMAN *v.* BANK OF GREENVILLE ET AL.

1. PERSONAL PROPERTY. *Mere contract to deliver; not a lien.*
   Where one, who is indebted to commission merchants, contracts in writing to ship them all the cotton grown or acquired by him during the year, the merchants do not thereby acquire any legal or equitable right or lien upon such cotton, and have no remedy against one who has purchased the cotton, even with notice of the contract. *Allen* v. *Montgomery,* 48 Miss. 101.

2. LIEN OF LANDLORD. *Assignability.*
   The lien of the landlord, conferred by ? 1301, code 1880, is assignable and passes by an assignment of the rent note.

3. SAME. *Remedy not confined to attachment.*
   The landlord's right as against the products raised on the leased land is broader than the remedy conferred by the statute regulating attachments for rent, and he is, therefore, not confined to the statutory remedy in enforcing his rights as to such products.

4. SAME. *Assignee cannot distrain.*
   Although the landlord's lien passes by assignment the assignee cannot resort to the statutory remedy of attachment for rent.

5. ASSIGNMENT OF RENT NOTE. *Estoppel. Case in judgment.*
   A landlord, who had taken a rent note from his tenant and indorsed it in blank, surrendered it to the tenant, and with it gave the tenant a letter addressed to creditors of the tenant, stating that he had surrendered to the tenant the note, which the latter "could use as he saw fit." On the faith of the letter the creditors paid value for the note. *Held,* that these facts estopped the landlord and the tenant and their privies from afterward denying that the note was a valid existing debt and a lien on the products of the rented land.

APPEAL from the chancery court of Washington county.

HON. W. R. TRIGG, Chancellor.

The facts are stated in the opinion.

*Phelps & Skinner,* for appellants.

There is no evidence in support of the allegation in the answer of Moyses & Co. that appellants agreed to make the advances upon receipt of evidence of the *extinguishment* of one of the rent notes and lien attached to it. There is no pretense that Moyses proposed to extinguish the note for the purpose of giving appel-

lant a mortgage on the crop thus disincumbered, but the pretense is that this was done to show appellants that Moyses & Co. could thereby ship them so much the more cotton, upon which appellants could reap commissions for selling. In other words, the purpose of the transaction was (as claimed) to enable appellants to earn commissions amounting to about fifty dollars, and for this they were to carry a large debt already due, advance three thousand dollars more, and all without any security, upon the crop released ! The absurdity is self-apparent.

The plain import of the letter from Johnson to appellants, accompanying the note indorsed in blank, constituted, in legal contemplation, a full and complete and unconditional assignment of Johnson's interest in the note as payee to appellants. The intention can only be gathered from the letter and the indorsement themselves. They cannot be contradicted by parol. Daniels on Neg. Instr., §§ 699, 717, 719. Even if the blank indorsement could be contradicted, the plain purport of the letter cannot be contradicted or varied.

From these the intention of Johnson was manifest. His writing that the crop was well advanced was to indicate to appellants that the *lien* thereon would be good security upon it for advances. He was also interested, as without the advances, the crop could not be made. The recital in the letter as to Moyses having extended favors to him, if it meant anything, meant not that they had paid the note—that would be no favor—but that they were extending him credit, or carrying him, and for that reason Johnson surrendered the note *to be used* as Moyses & Co. saw fit. The appellees play upon the word " surrendered "—surrendered for what purpose ?—to be canceled ? or to be *used ?* To us this seems an idle quibble.

Appellants were not concerned with the consideration or inducement given by Moyses & Co. to Johnson to obtain the indorsement and surrender of the note, and its transfer to appellants. It was enough that Moyses & Co. had obtained it in such shape as would apparently transfer title to it, and lead appellants to make the promised advances on the faith of it.

The estoppel against Moyses & Co. would operate as a transfer of the title to the note, and consequently of the lien which secured it. 2 Pom. Eq. Jur., §§ 801, 804, and the estoppel would bind all privies by contract or estate.   Ib., § 813; and consequently the estoppel binds appellees.

The parties to the transaction themselves did not intend it as an extinguishment of the note.   Their acts indicate this.   An innocent intention is to be presumed instead of a fraudulent one.   Moyses & Co., in fact, negotiated the note as a subsisting note and lien, and subsequently forwarding it to appellants, they refer to it as "placed" with them, asking for a receipt for it, as well as the mortgages, and acknowledge the delivery of the rent note as *security*.   The word "placed" is as well understood as the word "collateral."

It is true that ordinarily when a note gets back to the hands of the maker, its negotiability ceases, and he cannot, by putting it out again, bind the indorsers.   *Claiborne* v. *Planters' Bank*, 2 How. 727.   But says the court: "This transaction might have been susceptible of such an explanation as would probably have bound the indorsers."   In other words, if the indorsers consent to its being kept alive in the hands of the maker for negotiation, it would bind them.

An acceptor holding his immature acceptance, can negotiate it before maturity so as to bind an indorser.   1 Daniels Neg. Instr., § 781 (b.), citing: *Morley* v. *Culverwell*, 7 M. & W. 174; *Witte* v. *Williams*, 8 Rich. (S. C.) 290.

Regarding the one bale of mortgaged cotton received by appellees, the assignment and delivery of the mortgage upon it made appellants secure as to this.   Jones Chat. Mort. 518; Pom. Eq., § 734.

We deem it unnecessary to discuss the evidence pro and con, in reference to the fraud in the sale by Moyses & Co. to appellees, as the entire evidence appears in the record.                                   •

The appellants, by their written contract with Moyses & Co., had a legal right to the shipment of all the cotton that the latter controlled or owned or raised during the year, and any persons who knowingly assisted Moyses & Co. in the infringement of this

legal right by diverting the property should be held responsible for the consequent injury. Bump. Fr, Con. 15 and 16. No *lien* on the cotton is claimed under the contract, but only a liability because a purposed fraud was committed.

In view of the numerous decisions of our supreme court on the point, it is needless to discuss the assignability of the landlord's lien.

*Yerger & Percy*, for the Bank of Greenville, and The Goldsmith Cotton and Provision Co., appellees.

It seems too clear to admit of argument that as to the excess over the rent note due to appellants by Moyses & Co., they cannot hold appellees. It is nowhere alleged in the bill, and there is no testimony adduced to show, that the sale made by Moyses & Co., to his co-defendants was not honest and *bona fide*. On the contrary, the answers and proof show that the debts due to appellees by Moyses & Co., and the sale to pay them, were honest and free from any suspicion, and that appellees are *bona fide* purchasers.

• A pledge to ship cotton in consideration of advances made and to be made has never been held in this state to create a lien ; the commission merchant is only a creditor at large, without any equity, lien, or charge. *Allen* v. *Montgomery*, 48 Miss. 101.

So, the only question in the case is whether appellants have a lien on the crops raised on the lands leased to Moyses & Co. by Johnson, by virtue of the rent note held by them. We say not.

1. The simple assignment of a rent note does not carry the landlord's lien to the assignee. The landlord's lien requires no writing or record ; it exists by virtue of the relationship of landlord and tenant and is paramount and obtains equally against purchasers with and without notice. So our court has held, possibly against the weight of authority. Jones on Liens 577.

If " to hold the buyer of cotton liable to the landlord, when offered for sale in the large; active, open markets, without notice of a secret lien upon it, would so embarrass the marketing of almost the only salable product of our soil as to be exceedingly detrimental to both the agricultural and mercantile classes " (opinion of Simrall, J., in *Wooton* v. *Gwin*), it would be much more surely

contrary to public policy to extend such a secret lien to every holder of a rent-claim.

A purchaser of cotton might by diligence ascertain from the landlord if his rent has been satisfied, but it would greatly hamper commerce if the buyer must, especially under our system of farming, ascertain who is the holder of a negotiated rent note, and whether it is paid. Often there are as many as a hundred notes given for rent of one plantation by tenants, and perhaps all of these have been nogotiated. If the buyers were assured by landlord and tenant that the note had been paid, this would not estop or affect an assignee, if it were not in fact paid but outstanding. Or if the tenant produced the note, duly satisfied, this would not be assurance that it was the only rent note he owed.

The assignability of a mechanic's lien is not a parallel case. *Davis* v. *Bilsland,* 18 Wall. 659.

There is no reason of public policy why a mechanic's lien should not be held assignable. To so hold opens no door for fraud, and the rights of innocent purchasers are protected, as the lien does not bind them unless of record.

We know of no lien so omnipotent, notice of which exists merely from the relation of the parties, that is held to be so assignable. In this case there was a written lease which was not assigned, and the relation of landlord and tenant has not changed. Even in *Taylor* v. *Nelson,* 54 Miss. 524 (which is not an authority under the present statute), there was an assignment of the rent and contract of the lessees. If " it is just to assume that the legislature in conferring a right and providing a remedy for its enforcement gave the only right or remedy intended to be enjoyed by the object of its solicitude " (Campbell, J., in *Wooten* v. *Gwin*), is it not fair to presume that the remedy was the measure of the right?

Appellants, at best, were only the indorsees of the note in the usual course of business. An equitable lien will not pass by the transfer of the note representing the lien debt. Jones on Liens 991. Is there better reason for holding that this secret lien so passes ? We admit this position to be debatable, but upon our second position we rest confidently.

2. In fact, no assignment of the note and lien was made. There was no transfer of the note from Johnson to appellants; they did not purchase the note from him, nor did he deposit it with them, as a live thing, collateral to the debt of Moyses & Co. He simply gave up the note to the maker of it. He "surrendered" it. The use of this word is significant of Johnson's intention. In the first place it might be construed as limiting his liability as indorser, and then his letter to them apprised them, *not* that he assigned the note or indorsed it to them, but simply that Moyses & Co. had come by the note honestly.

Unless the note held by them was a live thing, representing a subsisting debt, it could carry no lien with it. If the note had been assigned by Johnson to appellants as collateral it would have evidenced a debt due, and if the main debt were paid, it would be returned to Johnson and the lien would remain as a security for the rent. But as they took it from Moyses & Co., who were the makers, and in the event of the payment of the principal debt they would have returned it to Moyses & Co. They had no transaction with Johnson. In other words, the lien existed, not for the purpose of securing the rent or rental note, but as a security for their debt. The consent of parties cannot raise a rental lien unless there is a debt for rent.

3. The testimony shows that the note had been paid by order, twelve hundred dollars in money and advances and a credit for the balance on the store books of Moyses & Co. The crops being well advanced and their condition apparently good, as a favor to Moyses & Co., Johnson accepted the credit at the store as a payment of the note due to him and surrendered the note to them. This being so, the landlord's lien was dead and could not be resuscitated.

*J. M. Jayne,* for appellee, J. E. Negus.

The answer and exhibits of respondents, Moyses & Co., show that the several notes secured by mortgages turned over by them to appellants as collateral security have been paid by the delivery of cotton by the several mortgagors to Moyses & Co., and by them shipped to appellants. But if this were not true, it could not present a question to be decided between complainants and defendants,

Negus, Pollock & Co., and Goldsmith Cotton and Provision Co. (except as to one bale of cotton), for none of the cotton purchased by them was covered by the mortgages held by appellants. As to the one bale, we hold there was no liability because the several debts secured by mortgage have been satisfied.

The only question in the case is whether appellants are entitled to enforce the statutory lien for rent, given to a landlord against a a tenant, so as to charge the cotton raised on the rented land and sold by Moyses & Co. to these appellees.

It may be true that a landlord may assign his claim for rent, and the assignee may enforce the lien in a court of chancery, yet we deny that in this case there was any assignment by the landlord, Johnson, of his rent or any part of it to appellants. He merely indorses the rent note in blank, and surrenders it to the tenant, accompanied by a letter which explains his meaning and limits his indorsement.

This note, accompanied by the letter, must be viewed as if the contents of the letter were written on the note. In the first place, Johnson did not deliver the note and letter to H. & C. Newman, but to the makers; secondly, the letter accompanying the note expressly says it was "surrendered" to Moyses & Co. The mention by Johnson in the letter of favors extended to him negatives the idea that he is to assign any interest on his rent. Why refer to the fact that the planting interests were well advanced, if he desired to make an assignment of the rent. It shows that Johnson, feeling that his rent was thus assured, desired to commend the prospect of a good crop for Moyses & Co., and they can show the surrender of the rent note. This will help their credit. They could use it as they saw fit, either with H. & C. Newman or any other factors, or they could burn it if they desired.

It cannot be said that Johnson assigned the rent note to appellants. Moyses & Co. had no power to assign it for Johnson, and no language was used which could effect such an assignment.

Assignments are usually expressed by the terms "transfer, set over, assign, convey, or grant, bargain, sell, or other words that show the intention of the parties to transfer." Bouvier Law Dict.

The only word that would have to be construed to effect the assignment here is "surrendered," which means to yield up, or give up, and cannot be used to denote a transfer.

But the note is shown to have been paid at the time of its surrender, except as to two hundred and fifty dollars, and this was paid by a credit on Moyses & Co.'s books. In any event, appellants received much more cotton from the rented place than enough to pay the rent note, and the credit should have been applied to the rent note and its lien, if any exists. As to the rest of the cotton, not raised on the rented land, appellees are unaffected by the agreement by Moyses & Co. to ship it to appellants. An agreement to ship cotton confers no lien or right in it.

COOPER, J., delivered the opinion of the court.

In the year 1887 Johnson leased his plantation, known as "Sligo," to Moyses & Co., at a rental of three thousand five hundred dollars, for which the tenants executed two promissory notes, each for one thousand seven hundred and fifty dollars, and due respectively on the 1st and 15th of November. Moyses & Co. were then indebted to appellants in a considerable sum, and desired to secure other advances during that year. Appellants were unwilling to make such advances unless satisfactory security should be given for the payment of the debt then due and that to accrue. On the 18th of March Moyses & Co. presented to appellants one of the notes executed by them to Johnson, indorsed by him in blank, and also a letter written by Johnson to appellants, of which the following is a copy :

" MESSRS. H. & C. NEWMAN,

NEW ORLEANS, LA.

DEAR SIRS :

Messrs. Sam. Moyses & Co. having extended favors to me, and as their planting interests on my place is well advanced, I have, at their request, surrendered to them one of the two rental notes given by them to me for the rent of my plantation, which they are at liberty to use as they see fit.

Very respectfully,      W. S. JOHNSON."

Moyses & Co. were conducting a mercantile business, and had secured from various customers mortgages upon crops to be grown to secure advances to be made during the year. It was accordingly agreed (and a written contract to that effect was entered into) that they should give to appellants their note for the sum of five thousand five hundred and seventy-three dollars and thirty-eight cents, due November 1, after date, which note should be then discounted by appellants, and the net proceeds placed to their credit, whereby the antecedent debt would be discharged and a balance left to their credit to be drawn against as occasion should require. The rent note indorsed by Johnson was deposited as security for the payment of this note of five thousand five hundred and seventy-three dollars and thirty-eight cents, and mortgages upon crops executed by the customers of Moyses & Co. to the extent of two thousand dollars, were also deposited as further security. It is only necessary to say that among these mortgages was one executed by one Jones. By the contract between the parties, Moyses & Co. were to ship in season all the cotton grown by them on the Sligo place, as well as all other cotton controlled by them, and Newman & Co. were authorized to apply any payments made either to the note or to any other debt they might have against Moyses & Co.

During the cotton season Moyses & Co. shipped a considerable quantity of cotton to Newman & Co., some of it being of their crop grown on the Sligo place, some of it being cotton collected from the mortgagors in the assigned mortgages, and some of it cotton acquired by Moyses & Co. in their business as merchants. No distinction was made in the method of shipments as between the various lots, nor was Newman & Co. informed as to what part was received from the one source or the other. Drafts were drawn against the shipments so that at the end of the season almost the entire proceeds of all cotton shipped had been exhausted in the payment of such drafts and in payment of their running account accrued after the credit derived from the discount of the note for five thousand five hundred and seventy-three dollars and thirty-eight cents had been exhausted.

In December, 1887, Moyses & Co., being indebted to the Bank of Greenville, to the Goldsmith Cotton and Provision Company, and to James E. Negus, sold to them their entire stock of goods, a large quantity of cotton, some of which had been grown on the Sligo place during that year, and one other bale which had been received by them from Jones as a payment on his mortgage debt; a quantity of corn also grown on the Sligo place, and all their personal property on said farm, consisting of horses, mules, farming implements, etc.

Newman & Co. exhibited the bill in this case against Moyses & Co., the Bank of Greenville, the Goldsmith Cotton and Provision Co., and Negus, seeking to subject the property sold by Moyses & Co. to the payment of their debt.

The grounds upon which complainants rest their right of recovery are:

1. That the sale by Moyses & Co. to the other defendants was made for the fraudulent purpose of defeating complainants in the collection of their debt.

2. That by virtue of the contract made between themselves and Moyses & Co., they acquired an equitable right to have all the cotton controlled by their debtors during the year 1887 consigned to them for sale for the payment of the debt due them, of which contract the other defendants had notice.

3. That the rent note for one thousand seven hundred and fifty dollars executed by Moyses & Co. to the landlord, Johnson, and by him delivered over to the tenants and by them deposited with complainants as collateral security, was a lien by law upon all the agricultural products grown on the demised premises during the term, and by the assignment of the note to them the lien also passed and is enforceable in their favor as against such products even in the hands of a *bona fide* purchaser.

4. That the one bale of cotton received by Moyses & Co. from Jones, mortgagee in one of the assigned mortgages, was the property of complainants held by Moyses & Co., as their agents, wherefore the purchasers acquired no title as against them.

There is no merit in the first and second positions. The first

fails for the reason that there is abundant evidence of the good faith of the purchasers of the property.

The second is untenable because by the contract made between complainants and Moyses & Co., complainants acquired neither a legal nor equitable right or lien upon the cotton agreed to be shipped. *Allen* v. *Montgomery*, 48 Miss. 101.

The real point in controversy between the parties is whether complainants have a landlord's lien upon the agricultural products grown on the Sligo place during the year, to secure the payment of the one thousand seven hundred and fifty dollar rent note of which they are in possession.

While we consider the question in its main aspects as virtually settled by previous decisions of this court, it is so earnestly pressed upon our attention by counsel that we review somewhat the subject and announce what we consider the result of previous adjudications.

The first inquiry that suggests itself is, what is the character of the right conferred by statute as against the agricultural products upon the landlord to secure the payment of rent and supplies advanced by him to his tenant? What are his remedies? And against whom may he recover the property?

The second inquiry will be whether the lien so held by the landlord is assignable, and if so, what remedy the assignee has to enforce his right; and finally whether the facts of this case show that the lien was transferred and is yet existing in the hands of complainants. .

At the outset it is important to note that § 1301 of the code, though a part of chapter 50, which deals with the subject of landlord and tenant, is distinguishable by its subject-matter from all other sections in that chapter. It creates a lien, a right against property therein enumerated, to secure the payment of rent and supplies. Other sections of the chapter are regulations of the common-law right of the landlord, enlarging them in some respects, limiting them in others, and substituting the statutory distress or attachment·for the common-law right of distress, which was enforceable by the landlord by his own private act without the necessity of re-

sorting to legal process or proceedings. Eliminating § 1301, we find in the residue of the chapter the recognition of a certain right or privilege in the landlord ; but the right so recognized had long been held to be a mere right to subject certain property to the payment of the rent due, a right to acquire a lien and enforce it by summary proceedings but not a lien. *Marye* v. *Dyche*, 42 Miss. 347 ; *Stamps* v. *Gilman*, 43 Miss. 456 ; *Arbuckle* v. *Nelms*, 50 Miss. 556. This right was dependent upon the privity of estate existing between the landlord and tenant, and though by the statutory provisions it was somewhat changed, being in some respects enlarged and in some restricted, it was yet in its nature left practically the same.

The right to seize property of a third person found upon the demised premises was abrogated ; but the landlord was given the right to follow for a limited time property removed from the premises (the same not having been sold to a *bona fide* purchaser for value) ; to sue out a warrant under certain circumstances, before the time fixed for payment of rent; to proceed notwithstanding the termination of the term, and an irregularity succeeding the seizure did not render the distress unlawful. But the remedy by which the right was to be secured and enforced was limited to the landlord or those holding the reversion (except that the administrator or executor might secure it) and an assignment of the rent due did not carry with it a right to the statutory remedy.

The history of the original of § 1301 is radically different. It began with the act of February 18, 1867, entitled "An Act for the encouragement of agriculture," Acts 1867, page 569.

This act had reference to the relation of debtor and creditor, and the liens therein provided for might be acquired under the statute by any one who should furnish the supplies therein enumerated to the owner or termor of lands devoted to agriculture. The liens permitted by this act were declared not to affect " any of the rights or remedies now allowed by law to the landlord for rent due or owing for any plantation or farm." Act of 1867, § 8.

By an act approved April 5, 1872 (Acts of 1872, page 131), a first lien was given to laborers by whom a crop should be cultiva-

ted, and this was declared to be superior to the rights of the land-lord for rent; and, subordinate to the lien of the laborer and to the right of the landlord, a supply lien was provided for in favor of the landlord to secure from the crop grown repayment for supplies advanced.

In 1876 the subject again underwent revision by the legislature. By the first section of the act approved April 14, 1876 (Acts of 1876, page 109), it was declared, " That there shall be a lien in favor of all landlords on all the agricultural products raised on the land of such landlord for the rent agreed to be paid by the tenant, and also a lien upon such products for all necessary family supplies and farming supplies and farming implements and stock furnished to or advanced to such tenant during the year that such products are raised; *provided,* such lien for supplies, stock, and implements shall not operate as against other persons to whom such tenant shall have given a deed of trust or mortgage for supplies for said year, and of which said landlord had notice before such advancing by such landlord."

By the fourth section of that act it was declared, such lien should exist " without recording, and whether the contract be in writing or not."

By act of January 27, 1877, it was provided that the word " notice " in the first section of the act of 1876 should be con-strued to mean actual and not constructive notice.    Acts, page 83.

Thus the law stood at the time of its codification in 1880.    In preparing that code the codifier assigned to a separate chapter (51) the subject of mortgages upon crops to be thereafter planted.    That chapter consists of one section and renders lawful a mortgage upon a crop to be grown within fifteen months ; but it is declared that such mortgages shall not be " prior to the liens provided for in an act in relation to landlord and tenant, and an act in relation to the lien of employers and employees."

Section 1301 of the code is as follows : " Every lessor of lands shall have a lien on all the agricultural products of the leased premises, however and by whomsoever produced, to secure the payment of the rent, and the fair market value of all advances

made by him to his tenant, for supplies for the tenant and others for whom he may contract, and for his business carried on upon the leased premises ; and this lien shall be paramount to all other liens, claims, or demands of any kind upon such products; and the claim of the lessor for supplies furnished may be enforced in the same manner and under the same circumstances as his claim for rent may be ; and all the provisions of law, as to attachment for rent and proceedings under it, shall be applicable to a claim for supplies, and such attachment may be levied on any goods and chattels liable for rent, as well as on the agricultural products aforesaid."

The lien of the laborer and of employer and employee was provided for in a separate chapter (chapter 52), and it is declared (§ 1361 of code) that such liens shall "exist by virtue of the relation of the parties as employer and employee, and without any writing or recording." And such liens shall be paramount to all liens or incumbrances or rights of any kind created by or against the person so contracting for such assistance, except the lien of the lessor of the land on which the crop is made, for rent and supplies furnished, as provided in the act in relation to landlord and tenant.".

The history of this legislation demonstrates that the lien secured to the landlord by § 1301 is of a much higher right, and intended so to be by the legislature, than is his right to seize and sell other goods and chattels of the tenant for the payment of the rent of the demised premises. The lien springs from the relations of the parties, exists without writing, is superior by express legislative declaration to the right of a mortgagee (who is purchaser for value) and to the claim of a laborer for his wages, which in turn is superior " to all liens or incumbrances or *rights* of any kind created by or against " the owner.

In *Henry* v. *Davis*, 60 Miss. 212, and in *Fitzgerald* v. *Fowlkes*, Ib. 270, we held that the right of the landlord as against the agricultural products was broader than the remedy afforded him by an attachment for rent under the provisions of chaper 50 of the code, of which § 1301 is a part; that it was not intended by the

legislature to restrict pursuit of such property to the circumstances under which the general goods and chattels, as to which the landlord has no lien, might be seized, and in *Cohn* v. *Smith*, 64 Miss. 816, it was held that an action might be brought by the landlord to recover the value of the agricultural products from one who had bought and converted them, with notice of the landlord's lien.

The result of the decisions is that the landlord is not confined to the statutory remedy to enforce his lien upon the products raised on the demised premises, and our conclusion is that the lien created by law exists without writing or record and must prevail even against a *bona fide* purchaser for value.

In *Taylor* v. *Nelson*, 54 Miss. 524, it was held that the lien of the landlord arising under the act of 1873 was assignable. We are unable to distinguish between the character of the lien created by that act and the one given by § 1301 of the code of 1880.

In *Gross* v. *Bartley, ante* 116, the question involved was whether the assignee of the rent could resort to the statutory attachment provided by chapter 50 of the code, and it was held that he could not, because by the very terms of the law such remedy could only be resorted to by one holding the reversion in the lands demised, or by his executors or administrator. The question of the assignability of the lien was not involved. We then thought, as we now decide, that the lien might pass to the assignee of the debt, but were constrained to deny resort to the statutory remedy, because of the limitations imposed on it by the language of the law.

It only remains, on this branch of the case, to inquire whether there was an assignment to complainants of the rent note.

Whatever may have been the purpose of Johnson, the landlord, in delivering the note to Moyses & Co., indorsed by him and accompanied by a letter addressed to complainants in which he informed them that Moyses & Co. were at liberty to " use the note as they saw fit," it was very naturally assumed by them that it was intended that the note should be deemed to be a living security for which they might treat with Moyses & Co.  If the note

66 MISS.—22

was paid or treated as paid by the parties, why was it indorsed by the payee? Why was it necessary to say that he had surrendered it to the makers; and why should he, who under such circumstances would have had no control over it, consent that the makers should deal with it as they saw fit? Whatever the facts may have been, it is manifest that complainants, induced thereto by the concurrent act of the landlord and tenant, have paid full value for the note as an existing debt secured by a lien upon the agricultural products of the Sligo place for the year 1887, and that both the landlord and tenant and those claiming under them are estopped to deny that such was the fact. The complainants, therefore, were entitled to subject to the payment of said note a sufficiency of the agricultural products in the hands of the defendants.

The goods and chattels of the tenants other than such products, having been sold to the defendants in good faith, cannot be subjected to said claim.

The one bale of cotton received by Moyses & Co. from Jones was the property of complainants in the hands of Moyses & Co., as agents, and the sale thereof in discharge of their own debt was not obligatory on complainants and interposes no bar to its recovery.

*The decree is reversed and cause remanded to the court below with instructions that a decree may be rendered in accordance with this opinion.*